

EXHIBIT
D

## FRANCHISE AGREEMENT

This Franchise Agreement made and entered into this **2nd** day of **August, 2005,** by and between **MORAN INDUSTRIES, INC.,** an Illinois corporation, with its principal office in Midlothian, Illinois, hereinafter called FRANCHISOR, and **Nerak, Inc.,** whose address is **6303 Cornell Ct. Georgetown, IN 47122,** hereinafter called FRANCHISEE;

## WITNESSETH:

WHEREAS, FRANCHISOR has expended time, effort, and substantial sums of money for the benefit of itself and its franchisees to acquire experience, knowledge and a reputation with the public with respect to the operation of specialized transmission service centers for automobiles, which centers sell automotive products and provide specialized automotive services in a unique and distinctive manner; and

WHEREAS, FRANCHISOR has built up valuable goodwill throughout portions of the United States in the name of "MR. TRANSMISSION" and in various products which are sold under the name of "MR. TRANSMISSION"; and

WHEREAS, the success of MR. TRANSMISSION and all authorized MR. TRANSMISSION franchisees depends upon the continuation of this goodwill and upon the continued operation of specialized transmission service centers adhering to the highest standards of business practices on the part of MR. TRANSMISSION's franchisees, and the maintenance by franchisees of efficient, prompt and courteous service to the public; and

WHEREAS, FRANCHISOR is the owner of the entire right, title and interest, together with all goodwill connected therewith, in and to a widely recognized trade name, trademarks, and service marks, know-how and information, including trade secrets, relating to the operation of specialized transmission service centers; and

WHEREAS, FRANCHISOR is engaged in the business of granting franchises/licenses for the operation of specialized transmission service centers (herein sometimes called "MR. TRANSMISSION SERVICE CENTER(S)" or "Center(s)" or "Service Center(s)") together with the right to use the know-how, decor and color scheme, trademarks, service marks, and trade names owned and developed by FRANCHISOR; and

WHEREAS, FRANCHISEE desires to obtain a license from FRANCHISOR for the use of said know-how, trade names, trademarks, service marks, and other rights in connection with the business of operating a MR. TRANSMISSION SERVICE CENTER in accordance with the highest business and ethical standards; and

WHEREAS, FRANCHISEE recognizes and acknowledges the unique relationship of each franchisee to the other, and to prospective franchisees and to the FRANCHISOR under the trade name of "MR. TRANSMISSION," and further recognizes and acknowledges the mutual benefits to be derived through the maintenance of certain uniform standards and policies set by the FRANCHISOR and derived through open communication and disclosures with the other franchisees and with the FRANCHISOR, and in reliance of each upon the other for the faithful performance of the terms and conditions of this agreement; and

WHEREAS, FRANCHISEE has made a full and complete independent investigation of this opportunity and consulted with any professionals deemed necessary by FRANCHISEE in FRANCHISEE's discretion; and

WHEREAS, FRANCHISOR has made no promises or inducements to FRANCHISEE not reflected in this Franchise Agreement, including but not limited to, projections or promises of any actual or prospective profits of this opportunity.

NOW, THEREFORE, in consideration of the premises and mutual agreements herein contained, FRANCHISOR and FRANCHISEE agree as follows:

1. <u>GRANT</u>. FRANCHISOR grants to FRANCHISEE, and FRANCHISEE hereby accepts a franchise for a MR. TRANSMISSION SERVICE CENTER, together with the right to use FRANCHISOR's know-how, trade names, trademarks, and service marks. The MR. TRANSMISSION SERVICE CENTER shall be operated from the following location:

13000 Middletown Industrial Blvd Middletown, KY 40243

If the above-described location is a market area rather than the exact premises on which the MR. TRANSMISSION SERVICE CENTER shall actually be constructed or operated, then FRANCHISEE must obtain an exact location approved in writing by FRANCHISOR within the said market area and must commence operations of the Service Center all within a reasonable time, not to exceed one year from the date hereof. FRANCHISOR may, however, in FRANCHISOR's sole discretion extend such one year period. Such extension, if granted, shall be in writing. FRANCHISOR's approval of an exact location selected by FRANCHISEE shall not be unreasonably withheld. This Agreement shall, at FRANCHISOR's option, terminate if Franchisee has not obtained an exact location approved in writing by FRANCHISOR and operations at an exact location within the market area described above have not been commenced by FRANCHISEE, all within said one year period, unless extended as set forth above.

Upon approval by FRANCHISOR of the exact location, it is agreed that the market area designated above in this paragraph shall then read as if the exact location and address were inserted herein at the time of the execution of this Agreement.

If the above-described location is an exact location which is to be leased by FRANCHISEE, FRANCHISEE further acknowledges that this Agreement is contingent upon the execution by all parties named therein of the attached Lease and Addendum, identified as Exhibit "A" and incorporated herein by reference.

The MR. TRANSMISSION SERVICE CENTER shall be operated under the terms and conditions of this Franchise Agreement solely at the location described herein or such other exact location as is approved by FRANCHISOR and at no other location during the term of this Agreement and any renewals. Relocation of the Center shall be selected and approved, including but not limited to completion of a market analysis and demographics study, in writing by FRANCHISEE and FRANCHISOR. FRANCHISOR reserves the right to grant additional franchises in the same City or County where said Center is situated, subject to the rights granted to FRANCHISEE in paragraph 2 below.

If the above-described location is not a market area, but an exact location containing a street address or other precise description of the location of the MR. TRANSMISSION SERVICE CENTER, then FRANCHISEE must commence operations of the center within 120 days from the date hereof. If FRANCHISEE fails to commence operations within said 120 day period, this Agreement may, at FRANCHISOR's option, terminate.

FRANCHISEE acknowledges that the Franchise Fee to FRANCHISOR has been earned by FRANCHISOR and FRANCHISOR shall not be obligated under any circumstances to refund said Franchise Fee.

FRANCHISEE further understands and agrees that FRANCHISEE is solely responsible for the acquisition of a location for the operation of the MR. TRANSMISSION SERVICE CENTER licensed hereunder and that FRANCHISOR's sole duty and responsibility hereunder shall be to approve or disapprove any location submitted by FRANCHISEE. FRANCHISEE acknowledges hereby that it has not been guaranteed or promised that FRANCHISOR will seek or obtain any such location; that FRANCHISOR has not guaranteed or promised FRANCHISEE that any such location submitted to FRANCHISOR will be approved; and that FRANCHISEE has been fully informed by FRANCHISOR, and understands and agrees hereby, that obtaining such approved location is FRANCHISEE's sole responsibility, and not the responsibility of FRANCHISOR.

2. <u>NON-EXCLUSIVITY</u>. FRANCHISOR shall not open another company-owned or other franchise center within three mile radius of FRANCHISEE'S location. No exclusive area or territory is

2

granted otherwise hereunder. FRANCHISOR shall have the right to establish company-owned Service Centers or to franchise additional Service Centers in any location FRANCHISOR deems desirable, subject to the procedures set forth below.

FRANCHISOR may, at any time, sell and/or develop additional MR. TRANSMISSION SERVICE CENTERS in the City or County in which FRANCHISEE's Service Center is located. If FRANCHISOR elects to increase the number of Service Centers in said City or County, it shall notify FRANCHISEE in writing. This written notice shall state the amount of franchise fee to be charged by FRANCHISOR in connection with the development of the additional MR. TRANSMISSION SERVICE CENTER(S) within said City or County. FRANCHISEE may apply for the franchise to be established within said City or County, but will not have the exclusive right to the franchise. FRANCHISOR shall evaluate FRANCHISEE's application and, in its sole discretion, either approve or disapprove purchase of the new franchise or franchises by the FRANCHISEE. If FRANCHISEE is approved for the purchase of such additional franchise or franchises, FRANCHISEE shall, within ten (10) days after FRANCHISEE receives notice of such approval, execute FRANCHISOR's then current Franchise Agreement and pay to FRANCHISOR the then current franchise fee for additional MR. TRANSMISSION SERVICE CENTERS (or such other fee as the parties may have agreed to in writing).

3.  <u>TERM</u>.  Unless terminated earlier in accordance with the terms set forth herein, this Agreement and the franchise granted hereunder shall have a term of twenty (20) years from the date hereof. At the expiration of such twenty (20) year period the franchise shall be automatically renewed for one additional twenty (20) year term, unless FRANCHISEE notifies FRANCHISOR in writing not less than six (6) months prior to the expiration of the initial term that FRANCHISEE does not wish to renew the franchise. Such franchise shall be renewed on the terms and conditions set forth in FRANCHISOR's then current Franchise Agreement and pay current renewal fee. Provided, however, that FRANCHISOR shall have the option to refuse to renew FRANCHISEE's franchise, unless all of the following conditions are met:

(a)   FRANCHISEE shall not be in default of any provision of this Agreement or any amendment or successor hereto or any other agreement between FRANCHISEE and FRANCHISOR or its subsidiaries and affiliates, and FRANCHISEE shall have fully and faithfully performed all of its obligations throughout the term hereof; and

(b)   FRANCHISEE shall execute FRANCHISOR's then current franchise agreement, which agreement shall supersede in all respects this Agreement, and pay any and all renewal fees which may be imposed by FRANCHISOR; provided, however, that FRANCHISEE shall not have any additional renewal rights; and provided further that any royalty fees shall be in accordance with the rate then in effect for new franchisees; and

(c)   FRANCHISEE will complete to FRANCHISOR's satisfaction all maintenance, refurnishing, renovation, modernizing and remodeling of the MR. TRANSMISSION SERVICE CENTER as FRANCHISOR shall reasonably require so as to reflect the then current image of a MR. TRANSMISSION SERVICE CENTER; and

(d)   FRANCHISEE shall be current in the payment of all obligations to FRANCHISOR and any of its affiliates or subsidiaries; and

(e)   Prior to renewal, FRANCHISEE, FRANCHISEE's manager or a designee of FRANCHISEE approved in advance in writing by FRANCHISOR shall at FRANCHISEE's expense, attend and successfully complete to FRANCHISOR's reasonable satisfaction any retraining program FRANCHISOR may require; and

(f)   FRANCHISOR shall be satisfied as to the operational and financial good standing both of FRANCHISEE and any MR. TRANSMISSION SERVICE

CENTERS operated by FRANCHISEE pursuant to a license from FRANCHISOR.

4. <u>CONSTRUCTION</u>. If the building in which the MR. TRANSMISSION SERVICE CENTER is to be located is to be constructed subsequent to the execution hereof, FRANCHISOR shall furnish FRANCHISEE with its standard plans and specifications for MR. TRANSMISSION SERVICE CENTERS upon written request of FRANCHISEE. Before commencing construction FRANCHISEE shall, at its expense, furnish to FRANCHISOR a copy of FRANCHISEE's plans and specifications for construction of the Service Center in proposed final form, which plans and specifications shall have been adopted from FRANCHISOR's standard plans and specifications and which, if approved, shall not thereafter be changed without FRANCHISOR's prior written consent.

5. <u>SIGNS</u>. FRANCHISEE recognizes that uniformity in the image projected to the public through signs is essential in creating goodwill among the public for MR. TRANSMISSION SERVICE CENTERS on a national basis. FRANCHISEE agrees to comply strictly with the specifications provided by FRANCHISOR from time to time for all signs used on the premises. FRANCHISOR will make available to FRANCHISEE for purchase signs meeting FRANCHISOR's specifications, but FRANCHISEE shall not be obligated to purchase signs from FRANCHISOR. FRANCHISOR reserves the right to modify the specifications in accordance with any applicable local, city, county, state and/or federal codes, laws, rules, regulations, ordinances and/or requirements. Such modifications may include size, construction, material, lighting, etc.

6. <u>TRAINING AND SITE LOCATION ASSISTANCE</u>. (a) Prior to the public opening of FRANCHISEE's Service Center, FRANCHISOR will make available to the FRANCHISEE training courses consisting of an three weeks "hands-on" observe and learn in-center training course followed by a one week classroom course, the "franchisee's school." FRANCHISEE agrees that FRANCHISEE will, if FRANCHISEE is an individual, or one of the partners of FRANCHISEE if FRANCHISEE is a partnership, attend and complete the franchisees' school to FRANCHISOR's reasonable satisfaction prior to the opening of the MR. TRANSMISSION SERVICE CENTER. If FRANCHISEE is a corporation or partnership, the officer or partner in charge of the operations of FRANCHISEE must attend and complete the franchisees' school to FRANCHISOR's reasonable satisfaction. FRANCHISEE further agrees that the person who will manage the MR. TRANSMISSION SERVICE CENTER, whether such person is the FRANCHISEE or his designee, must attend and complete the managers' school prior to the opening of the MR. TRANSMISSION SERVICE CENTER licensed herein. Any person whom the FRANCHISEE desires to appoint as manager of the Service Center after its opening must also attend the next available managers' course after assuming his duties as manager.

(b) In the event the franchise is not operational within 180 days after the completion of the franchisees' school by the appropriate individual, in addition to any other rights FRANCHISOR may have under this Agreement for such failure to open, said individual must re-attend and complete to FRANCHISOR's reasonable satisfaction such portions of the franchisees' school as FRANCHISOR deems necessary.

(c) FRANCHISEE shall also attend such further training and instructional courses, together with any meetings, as FRANCHISOR may from time to time determine to be necessary in order to ensure that the FRANCHISEE continues to provide high standards of expertise and service to the public.

(d) FRANCHISOR's training courses shall take place at such location as FRANCHISOR shall designate and shall be at no charge to FRANCHISEE; however, FRANCHISEE shall be responsible for his own expenses in attending such courses including, without limitation, travel, meals, lodging, and transportation.

(e) FRANCHISEE acknowledges that attendance at FRANCHISOR's training programs is important to the success of both FRANCHISOR and FRANCHISEE, and FRANCHISEE agrees to attend these programs. The failure of FRANCHISEE to attend any training course or meeting which FRANCHISOR shall notify FRANCHISEE that FRANCHISEE must attend shall, at FRANCHISOR's option, result in the termination of this Agreement and forfeiture of any monies paid by FRANCHISEE to FRANCHISOR.

4

(f) FRANCHISOR may, upon request, and according to FRANCHISOR's established procedure, and based solely on its scheduling requirements, visit any site upon which FRANCHISEE proposes to establish his MR. TRANSMISSION SERVICE CENTER for the sole purpose of approving said site for said purpose; provided, however, that the responsibility for selecting a location acceptable to FRANCHISOR is the sole responsibility of FRANCHISEE and by providing such site approval, FRANCHISOR does not guarantee, promise or warrant in any way that FRANCHISEE will be successful in selecting or obtaining an acceptable site. It is expressly agreed that such site approval does not affect FRANCHISEE's obligations for commencement of operations in accordance with paragraph 1 hereof and shall not be construed as, in any way, giving rise to a claim by FRANCHISEE for refund of any monies paid by FRANCHISEE to FRANCHISOR, or any other such claim, including, but not limited to, failure of consideration, estoppel or that FRANCHISEE should not be required to open its Service Center as required in this Franchise Agreement.

(g) FRANCHISOR may, at FRANCHISOR's sole discretion as to time after the opening of FRANCHISEE's Service Center, provide a qualified representative of FRANCHISOR who shall, at FRANCHISOR's expense, assist FRANCHISEE in the operation of FRANCHISEE's Service Center for such period of time as deemed necessary by FRANCHISOR. After the initial opening, FRANCHISOR shall continue to provide supervisory assistance to FRANCHISEE, at FRANCHISOR's expense, at such times and in such manner as the FRANCHISOR shall consider advisable or appropriate. In order to facilitate this assistance and increase its effectiveness, the FRANCHISEE shall allow a representative or representatives of the FRANCHISOR on FRANCHISEE's premises at any time during normal working hours, and shall make available to such representative(s) any information requested and permit said representative(s) to inspect the premises, equipment, inventory, supplies, and merchandising methods, as well as to make such tests or surveys as the representative(s) considers necessary. FRANCHISEE understands and agrees that FRANCHISOR does not promise, warrant or guarantee any such visits or the number thereof, and acknowledges hereby that any such visits will be at the sole and absolute discretion of FRANCHISOR as to timing and number, and that no minimum number of visits is required hereby.

(h) FRANCHISOR may, at its option, also from time to time schedule conferences to which all franchisees or their representatives shall be invited. FRANCHISEE understands the importance of such meetings scheduled by the FRANCHISOR, and FRANCHISEE agrees to attend these conferences. These conferences will normally cover such topics as merchandising techniques, training of personnel, performance standards, advertising programs, and procedures. All such training sessions shall be at the expense of FRANCHISOR, but FRANCHISEE shall be responsible for his own expenses for transportation, food, lodging and other costs in attending said training.

(i) FRANCHISEE understands and agrees that his actual participation in the operation of the MR. TRANSMISSION SERVICE CENTER shall be either on a full-time basis or as an owner-investor. If as a full-time operator, FRANCHISEE agrees hereby to operate the MR. TRANSMISSION SERVICE CENTER licensed hereunder on a full-time basis and agrees that he shall not engage in, or be interested in, or participate in, any other business or employment in any way, unless FRANCHISOR gives its prior, written consent thereto. If an owner-investor, such owner-investor shall be obligated to have a trained center manager at all times. This center manager will have attended a training program through Moran Industries, Inc. or be approved by the Corporate Services Department by Moran Industries, Inc. due to the center manager's previous experience within the system. The owner-investor must attend the one week franchise management training school in Midlothian, Illinois or designate an individual to attend. Should the trained, operating franchisee no longer be able to serve in that capacity, the owner-investor must designate another individual. That individual must arrange to attend the one week franchise management training school in Midlothian, Illinois within ninety (90) days of the departure of the current trained, operating partner. (If FRANCHISEE is a partnership or corporation, then the managing partner or corporate officer in charge of operation agree to the terms hereof.)

7. <u>AGREEMENT OF FRANCHISEE WITH REGARD TO FRANCHISOR'S NAME AND PROPRIETARY MARK.</u> FRANCHISEE hereby acknowledges the validity of the proprietary mark "MR. TRANSMISSION," and also acknowledges that it is the property of FRANCHISOR. FRANCHISEE shall commit no acts which in any respect infringe upon, harm or contest the right of FRANCHISOR in the

5

proprietary mark or in any other mark or name which incorporates the name "MR. TRANSMISSION." FRANCHISEE agrees to purchase all materials with FRANCHISOR'S proprietary marks from FRANCHISOR or have all materials with FRANCHISOR'S proprietary marks approved by FRANCHISOR.

All the rights and privileges granted to FRANCHISEE herein are for FRANCHISEE's enjoyment at the location described in paragraph 1 and nowhere else, and FRANCHISEE shall never (either during the term of this Franchise Agreement or after its expiration or termination) use or attempt to use the name "MR. TRANSMISSION" or "MR. TRANSMISSION SERVICE CENTER" or any variation of such names or any other trade name, trademark or service mark of FRANCHISOR in any manner whatsoever, except in connection with the operation of the MR. TRANSMISSION SERVICE CENTER herein licensed, including, but not limited to, use of any telephone numbers listed in any directory under FRANCHISOR's trade names, trademarks or service marks, use of advertising in any form which states, in any way, that any operation was formerly connected with or known as MR. TRANSMISSION, or the representation to any person or entity that the business being conducted therein is the same or similar to that which operated previously.

The Service Center operated by FRANCHISEE under the terms of this Franchise Agreement and at the location specified herein (or if no location is specified herein, at the location where FRANCHISEE opens or operates any MR. TRANSMISSION SERVICE CENTER for any period of time whatsoever) shall be conducted under the name "MR. TRANSMISSION" and under no other name. However, FRANCHISEE shall not use the expression "MR. TRANSMISSION" in its firm name or corporate name, notwithstanding the fact that FRANCHISOR grants to the FRANCHISEE the right to incorporate as set forth in paragraph 21(e) of this Agreement. Further, FRANCHISEE agrees to make no domain registration or establish a website utilizing the FRANCHISOR'S servicemarks.

FRANCHISEE recognizes that the use by him of the proprietary mark, or any other mark or name that incorporates the words "MR. TRANSMISSION," inures to the benefit of FRANCHISOR, and that any goodwill arising from such use by FRANCHISEE belongs to FRANCHISOR and shall revert to FRANCHISOR in the event that this Agreement is terminated for any reason. If it becomes advisable at any time in our sole discretion to modify or discontinue the use of any name or mark and/or use one or more additional or substitute name or marks, you will be responsible for the tangible costs (such as replacing signs and materials) associated therewith.

8. <u>UNIFORM STANDARDS.</u> In order to protect the goodwill associated with the FRANCHISOR's name and to prevent any deception to the public, the FRANCHISEE shall operate his business in accordance with the standards and requirements of quality, appearance, cleanliness, and service as are from time to time prescribed by the FRANCHISOR. The FRANCHISEE shall maintain the interior and exterior of the premises in a neat, sanitary, orderly and clean condition satisfactory to FRANCHISOR, and shall make such repairs and renovations as FRANCHISOR may reasonably request including, without limitation, repair and painting of the exterior and interior of the MR. TRANSMISSION SERVICE CENTER. In the event that the FRANCHISEE fails to comply with FRANCHISOR's standards within ten (10) days after written notice thereof from FRANCHISOR, FRANCHISOR may, notwithstanding any other rights FRANCHISOR may have pursuant to this Agreement, have such repair, painting or other renovation done at FRANCHISEE's expense. FRANCHISEE will install and maintain all lighting, including that for the interior and exterior of the building, in strict accordance with FRANCHISOR's specifications; FRANCHISEE shall also perform in all respects its obligations as set forth in any Lease of the premises to which FRANCHISEE is a party.

In order to ensure the continued uniformity of operation, FRANCHISEE shall use, at FRANCHISEE's expense, only such repair order forms and sales invoice forms as are furnished by the FRANCHISOR.

FRANCHISEE recognizes that the continuous and daily availability of products and services to the public is essential to the adequate promotion of the MR. TRANSMISSION SERVICE CENTERS and that any failure to provide such products and services affects the goodwill of FRANCHISOR both locally and nationally. Therefore, FRANCHISEE agrees (a) to maintain adequate inventory (as more fully described herein) and trained personnel to serve the public; and (b) except to the extent that any law may require otherwise, to keep open and in normal operation the MR. TRANSMISSION SERVICE CENTER

for and during the hours of 8:00 a.m. to 5:30 p.m. Monday through Friday and 9:00 a.m. to 1:00 p.m. on Saturday, or for such other hours as may be specified by FRANCHISOR, which hours shall not be unreasonable in accordance with the standards of the transmission repair industry. FRANCHISEE shall not be required to operate its business on New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving or Christmas. In an area market with multiple service centers, additional hours and holidays shall be determined by the majority of the service centers in the market area, subject to FRANCHISOR's approval.

FRANCHISEE further agrees that it will sell or distribute from the MR. TRANSMISSION SERVICE CENTER only such types of products or services as are approved by FRANCHISOR; provided, however, that FRANCHISEE shall have the sole right to determine the prices for resale to its patrons for such products or services. FRANCHISEE shall purchase its parts and inventory from FRANCHISOR or such approved vendors as are identified in paragraph 13.

Without limiting any of the language elsewhere in this Agreement, FRANCHISEE agrees at all times to require a high moral and ethical standard of conduct from its employees and to maintain the premises and all equipment, fixtures and facilities in such a manner as required by municipal, state and county regulations. FRANCHISEE further agrees to provide all customers of the MR. TRANSMISSION SERVICE CENTER efficient, courteous and high quality service to the end that the Service Center shall help create goodwill among the public for MR. TRANSMISSION SERVICE CENTERS as a whole, and that FRANCHISOR, FRANCHISEE, and each franchise holder shall be benefited and the public assured of uniform, efficient, courteous and easily recognizable high quality service on a standardized national basis. Towards this end, the employees of FRANCHISEE shall at all times during said employment wear only uniforms which meet the exact requirements of FRANCHISOR, present a neat and clean appearance and render competent, sober, honest, and courteous service to FRANCHISEE's patrons.

FRANCHISEE agrees that it shall thoroughly investigate the employment history of all employees hired to work for FRANCHISEE and shall not hire any person who has been convicted of any felony, larceny, or other acts of moral turpitude. FRANCHISEE agrees to immediately discharge any employee upon notification from FRANCHISOR that said employee has been convicted of any felony involving fraud, embezzlement, larceny or any other act involving moral turpitude or upon notification by FRANCHISOR that the employee has previously been terminated by FRANCHISOR or any other franchisee of FRANCHISOR because of conduct involving fraud, embezzlement or larceny, or other acts of moral turpitude. Failure to immediately discharge such an employee after the aforesaid notification by FRANCHISOR shall constitute an event of default hereunder.

FRANCHISEE agrees at all times to diligently promote the business of the MR. TRANSMISSION SERVICE CENTER and to make every reasonable effort to maximize the sales of its products and services. To this end, except as set forth in paragraph 6 of this Agreement, FRANCHISEE agrees that he (or the partnership or corporation, if applicable) shall not engage in any other business, employment, or occupation, and shall operate and manage the business licensed hereunder on a full-time basis. The FRANCHISEE acknowledges that strict conformity with the standards set forth in this paragraph will assist in accomplishing this goal.

9. ADDITIONAL OBLIGATIONS OF FRANCHISOR. FRANCHISOR agrees that it may, in its discretion, in addition to all the obligations hereinabove recited, make available the following services to FRANCHISEE:

(1) Furnish from time to time, at FRANCHISOR's sole discretion, counseling and advisory services and suggestions in the planning and development of FRANCHISEE's business;

(2) At FRANCHISOR's sole discretion, apprise FRANCHISEE from time to time of FRANCHISOR's plans, policies, research, and new developments by means of bulletins, brochures, reports, and at FRANCHISOR's option, by periodic visits of FRANCHISOR's field representatives;

(3) Permit FRANCHISEE to attend, at FRANCHISEE's cost and expense, any national or regional meetings sponsored by FRANCHISOR for other franchise holders;

(4) Conduct from time to time, at FRANCHISOR's sole discretion and expense, research and development into the areas of production and methods of operation, and make the results of this research and development available to FRANCHISEE;

(5) Provide newspaper mats, decals and all other advertising and promotional tools which may be developed from time to time by FRANCHISOR through the MR. TRANSMISSION COOPERATIVE ADVERTISING FUND to FRANCHISEE or to the chairman of the local advertising group if one exists in FRANCHISEE's area;

(6) Provide protection of the FRANCHISEE against trademark, service mark, or patent infringement as regards any trade name, service mark or trademark of FRANCHISOR, including the institution of suit or complaint when the same is deemed advisable by FRANCHISOR.

(7) Defend and save harmless FRANCHISEE against all claims which may hereinafter be asserted for service mark or trademark infringement of any of the trademarks or service marks authorized by FRANCHISOR for use by FRANCHISEE.

10. <u>FRANCHISEE FEE</u>. The FRANCHISE FEE is payable upon the execution of this agreement by FRANCHISEE in full. FRANCHISEE understands, acknowledges and agrees that the Franchise Fee payable hereunder is fully earned by FRANCHISOR upon receipt, is in payment of the franchise granted hereunder, and is not refundable at any time for any reason whatsoever. FRANCHISEE hereby expressly waives any and all rights which it now has or may in the future acquire, in law or equity, to demand the return of all or any part of the Franchise Fee paid hereunder, for any reason whatsoever. FRANCHISOR acknowledges the receipt of Twenty Seven Thousand Five Hundred Dollars ($27,500.00) from FRANCHISEE as payment of the Franchise Fee hereunder. FRANCHISEE acknowledges and agrees that additional franchise fees, the amount of which shall be established by FRANCHISOR, shall be required if and when franchises for additional locations are granted to FRANCHISEE, and renewal fees may be required in order to renew this Franchise Agreement for the additional term provided for herein.

11. <u>ROYALTY FEE.</u>  Following the commencement of operations by FRANCHISEE, FRANCHISEE shall pay to FRANCHISOR, in weekly amounts (to be mailed and post-marked not later than Wednesday of each week during the term hereof and to be received by FRANCHISOR by Friday of each week), a royalty fee in a sum equal to seven percent (7%) of the gross sales, as hereinafter defined, made by FRANCHISEE during the preceding calendar week.

The expression "gross sales" as used in this Agreement shall consist of all sales of any kind whatsoever made regardless of whether cash payment is actually received by FRANCHISEE at the time of the transaction, including credit card sales and accounts receivable sales, in connection with the exercise of the franchise granted hereunder including, but not limited to sales of automotive supplies, accessories, gas, oil, repair parts and/or any service or product sold within or without the Service Center being operated by the FRANCHISEE under this franchise, excluding intra-company warranty repairs. The term "gross sales" shall not include sales tax, excise tax or other tax with respect to such sales, but shall include "business interruption" insurance payments.

FRANCHISEE shall mail weekly to FRANCHISOR (i) an accurate business report showing the gross sales received by it during the preceding calendar week on such forms as are provided by FRANCHISOR at FRANCHISEE's expense, (ii) a check, cashier's check or money order in full payment of all royalty fees due, and (iii) such other forms and/or reports as are specified in paragraph 12. The preceding items shall be mailed to FRANCHISOR so as to be received in the offices of FRANCHISOR no later than Friday of each week. Royalties shall be paid without penalty if mailed and postmarked not later than Wednesday and received by FRANCHISOR on or before Friday of each week. FRANCHISEE shall pay any and all fees and other charges in connection with this Franchise Agreement (including, without limitation, the continuing franchise fees, royalty fees, continuing advertising fee, equipment, supplies and advertising charges, and any applicable late fees and interest charges) by electronic, computer, wire, automated transfer, ACH debiting, and bank clearing services (collectively "Automated Payment"), and FRANCHISEE shall undertake all action necessary to accomplish such transfers. If FRANCHISEE fails to pay its royalties as set forth above, FRANCHISEE shall pay the following late payment charges to

FRANCHISOR: (1) a one percent (1%) additional gross sales royalty shall be paid by the FRANCHISEE in any week where the royalty payment is not paid, an additional one percent (1%) gross sales royalty shall accrue against the current week's royalty and the past due royalty, i.e., if late one (1) week, the royalty shall be eight percent (8%); if late two (2) weeks, the royalty shall be nine percent (9%); if late three (3) weeks, the royalty shall be ten percent (10%). At the expiration of the first five year period and at the expiration of each five year period thereafter during the term of this Agreement, FRANCHISOR, may adjust said royalty fee provided, that said royalty fee will not exceed ten percent (10%) of gross sales at any time during the term of this Agreement.

FRANCHISOR, FRANCHISOR's accounting firm, other representatives who may be designated by FRANCHISOR, or other duly authorized agents of FRANCHISOR, shall have the right during business hours to audit or examine, without limitation, at FRANCHISOR's expense, the repair orders, receipts, bank records, accountant's or bookkeeper's records, credit bureau records, books, business machines, records, tax returns and other returns of FRANCHISEE; and FRANCHISEE agrees to keep complete and accurate books and records of its operation of the MR. TRANSMISSION SERVICE CENTER. FRANCHISEE shall immediately remit to FRANCHISOR any service charges which such audit reveals are due plus interest on such service charges at the highest rate allowed by law from the date any such service charges became due. In the event that any such audit discloses an error in the computation of the total gross sales made from or on the premises in excess of two percent (2%), the FRANCHISEE shall also pay or reimburse FRANCHISOR for any and all expenses incurred by FRANCHISEE in connection with the audit, including, but not limited to, legal and accounting fees. This right of inspection by FRANCHISOR, its accountants or authorized agents shall continue for a period of one hundred eighty (180) days after expiration or termination of this Agreement by either party.

In the event any audit discloses that FRANCHISEE has any repair orders which are missing or unaccounted for, FRANCHISEE agrees to pay the then current royalty fee/percentage on each such repair order based upon an amount equal to $2,000 for each repair order sale or the amount equal to the average repair order for the MR. TRANSMISSION SERVICE CENTER, whichever is greater, the same as if such repair order or orders had been submitted to FRANCHISOR with such amount thereon.

In the event that FRANCHISEE is more than ten (10) days late in paying any service charge, other than royalty fees, interest shall accrue on said service charge at the highest rate allowed by law from the date payment was due. All reports required to be furnished pursuant to this paragraph and paragraph 12 must be signed by the FRANCHISEE.

FRANCHISOR or its designated agent shall have the right at all times to conduct investigations of the operations of FRANCHISEE, at FRANCHISOR's expense. In conducting such investigations FRANCHISEE shall permit FRANCHISOR or FRANCHISOR's designated representative complete access to its books, business machines, records, premises and operations, and shall allow FRANCHISOR to interview FRANCHISEE's employees. In the event that such investigation reveals that the FRANCHISEE has committed any fraudulent or illegal act with respect to the operation of the MR. TRANSMISSION SERVICE CENTER, the FRANCHISOR, in addition to all other rights and remedies it may have pursuant to this Agreement, shall be reimbursed by FRANCHISEE for the expense of the investigation.

Should any of the FRANCHISEE's checks be returned by his bank to FRANCHISOR for any reason whatsoever, FRANCHISEE shall pay FRANCHISOR, in addition to any other charges or expenses incurred by FRANCHISOR, a Twenty-Five Dollar ($25.00) returned check charge. Should FRANCHISOR receive two (2) or more insufficient funds to stop payment checks in any twelve (12) month period during the term of this agreement, then in addition to any other rights FRANCHISOR has, FRANCHISOR may require FRANCHISEE to make all further payments to FRANCHISOR by cashier's check or money order.

12. <u>REPORTS</u>. In addition to the reports required pursuant to the preceding paragraphs, FRANCHISEE agrees to furnish FRANCHISOR with the following reports: (i) a weekly report, signed by FRANCHISEE, setting forth the amount of all deposits, repair orders and sales invoices for every type and nature of repair and sale; FRANCHISEE shall attach to this report copies of all deposit slips, repair orders and sales invoices; (ii) a monthly report, in a form specified by FRANCHISOR, signed by FRANCHISEE, containing a monthly balance sheet and profit and loss statement as well as a monthly

accounting, numerically, of all repair orders; such report shall be furnished to FRANCHISOR within thirty (30) days of the end of each calendar month; (iii) an annual financial statement covering the operation of FRANCHISEE's MR. TRANSMISSION SERVICE CENTER, such financial statement to be prepared by an independent public account and to be certified as to its correctness by the FRANCHISEE, or in the event the FRANCHISEE is a corporation, by an officer of the FRANCHISEE. Said financial statement shall be furnished within one hundred twenty (120) days after the end of FRANCHISEE's fiscal year. The profit and loss statement and balance sheet shall contain such information as FRANCHISOR shall reasonably request, including, for example, the information necessary to verify payments due FRANCHISOR under any provision of this Agreement; (iv) upon request of FRANCHISOR, FRANCHISEE shall furnish more frequent reports of gross sales and/or sales by telephone or other means of communication specified by FRANCHISOR; (v) in order to ensure the uniformity of operation and to make maximum effectiveness of the available information concerning Service Center operation, marketing and financial data, and FRANCHISEE shall also submit to FRANCHISOR such additional financial and operating information as FRANCHISOR shall request from time to time.

All written reports shall be made only on forms approved by FRANCHISOR or supplied by FRANCHISOR to FRANCHISEE, at FRANCHISEE's expense. All reports or other information furnished by FRANCHISEE shall be received and treated confidentially by FRANCHISOR; provided, however, that FRANCHISOR may use any such information for the compilation of operating statistics on all of FRANCHISOR's franchises, or groups thereof, for intra-company and public distribution.

FRANCHISEE may keep his books and records on either a calendar year or fiscal year basis. All references in this paragraph to the "year" of FRANCHISEE shall mean either the calendar or fiscal year adopted by FRANCHISEE.

13. <u>INVENTORY AND QUALITY CONTROL</u>. In order to insure consumer acceptance both on a local and national level, FRANCHISEE recognizes the necessity of quality control and standardization as essential conditions of the Franchise Agreement. FRANCHISEE agrees to purchase all items used in the operation of a MR. TRANSMISSION SERVICE CENTER, including equipment, inventory, parts and supplies from FRANCHISOR, or any subsidiary or division of FRANCHISOR, the original equipment manufacturer ("OEM"), or such other vendors as are approved by FRANCHISOR, which approval shall not be unreasonably withheld when such other vendors can meet FRANCHISOR's standards and specifications, including inspection standards. Should FRANCHISEE desire to purchase any item from a source not previously approved by FRANCHISOR, FRANCHISEE shall notify FRANCHISOR in writing and submit such details and specifications regarding the item as FRANCHISOR may require. FRANCHISOR will advise FRANCHISEE within a reasonable time whether the item FRANCHISEE proposes to buy meets FRANCHISOR's approval. The terms of all purchases from FRANCHISOR or its divisions (hereinafter sometimes collectively referred to as the "Company Suppliers") shall be COD or "net ten (10) days" or such other terms as the Company Suppliers shall establish. The Company Suppliers shall have the right to require prepayment, if, in their opinion, FRANCHISEE's financial condition or other circumstances do not warrant shipment in advance of payment.

FRANCHISEE shall submit its orders for inventory to the Company Suppliers in sufficient time to enable them to fill the orders in the usual course of business. The Company Suppliers shall not be liable for any delay in the delivery of any orders, including the delivery of said parts, if such delay is occasioned by any cause whatsoever beyond the Company Suppliers' reasonable control.

14. <u>ORIGINAL EQUIPMENT AND SUPPLIES</u>. Prior to the opening of FRANCHISEE's Service Center, FRANCHISEE shall acquire equipment, supplies and inventory authorized by the FRANCHISOR. FRANCHISEE may purchase the equipment from any authorized OEM, the Company Suppliers or other vendors approved by FRANCHISOR (which approval shall not be unreasonably withheld when it can be demonstrated that said vendor meets FRANCHISOR's standards and specifications, including inspection standards).

15. <u>DISCLAIMER OF WARRANTY AND LIMITATION OF LIABILITY</u>. THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, MADE BY FRANCHISOR OR THE COMPANY SUPPLIERS COVERING ITEMS SOLD BY FRANCHISOR OR ANY OF THE COMPANY SUPPLIERS TO

FRANCHISEE PURSUANT TO THIS AGREEMENT AND HEREAFTER. FRANCHISEE's remedy for defective items is limited to replacement of the defective items and neither FRANCHISOR nor any of the Company Suppliers shall not be liable for any incidental or consequential damages, whether brought in warranty, negligence, misrepresentation, strict liability, or any other theory, as a result of selling or supplying any items pursuant to this Agreement. Any warranty which is furnished to the customer by the MR. TRANSMISSION SERVICE CENTER is extended by FRANCHISEE to the customer and not FRANCHISOR to either the FRANCHISEE or the customer, and is a personal obligation of FRANCHISEE.

16. <u>SERVICE CENTER WARRANTIES</u>. FRANCHISEE shall honor each warranty agreement presented by a customer at FRANCHISEE's center in accordance with the terms thereof, irrespective of whether the transmission was originally repaired at FRANCHISEE's Service Center or any other authorized MR. TRANSMISSION SERVICE CENTER. In addition, FRANCHISEE shall comply at all times with FRANCHISOR's policies in force and effect from time to time concerning the MR. TRANSMISSION WARRANTY PROGRAM. Without limiting the foregoing, FRANCHISEE shall also satisfy legitimate customer complaints concerning any service performed or parts sold pursuant to the warranty program.

FRANCHISEE, upon complying with provisions in this paragraph with respect to the customer of another authorized MR. TRANSMISSION SERVICE CENTER, shall be reimbursed by the other Service Center upon making written demand upon such Service Center in accordance with FRANCHISOR's intershop warranty policies and procedures.

FRANCHISEE agrees to pay within five (5) working days after such demand to any other MR. TRANSMISSION franchisee the amount due to such franchisee for the honoring of a warranty to a customer of FRANCHISEE. If FRANCHISEE fails to timely pay such amount, FRANCHISEE shall be in default of this Franchise Agreement, and in addition to any remedies it may have for breach of this agreement, FRANCHISOR shall be entitled to recover such amount from FRANCHISEE for the benefit of the franchisee which honored the warranty, by FRANCHISOR shall not be obligated to do so.

Prior to the opening of its service center, FRANCHISEE shall pay to FRANCHISOR the amount of Three Thousand Dollars ($3,000.00) to be held by FRANCHISOR in a warranty fund to pay any claims for warranty repairs which FRANCHISEE may fail to honor, on service center warranties or reimbursements that are unpaid and for warranties which are the responsibility of any center which has closed for any reason and not reopened.

If this franchise has been transferred, FRANCHISEE agrees to honor all warranties issued by his predecessor as if the warranty had been issued by FRANCHISEE under the guidelines of the FRANCHISOR's current policies and procedures in effect concerning the MR. TRANSMISSION warranty program. This deposit may be refundable 90 days after completion of resale or transfer if terms and conditions are met.

17. <u>ADVERTISING</u>.

(a) <u>Transmission USA Creative Marketing Fund</u>. Recognizing the value of creating advertising concepts and the importance of the standardization of advertising, FRANCHISEE agrees to participate in a TRANSMISSION USA creative marketing fund for the creation and production of marketing concepts and distribution of creative advertising and shall contribute thereto $100.00 per month. FRANCHISEE agrees that the amount to be paid to such advertising fund by the FRANCHISEE may be adjusted by FRANCHISOR from time to time but in no event shall exceed 1% of gross sales per month during the term of this Agreement. FRANCHISEE shall remit the appropriate amount with the first payment of royalties for the month by check or Automated Payment bank draft payable to the TRANSMISSION USA CREATIVE MARKETING FUND, a separate creative marketing account which has been opened for the exclusive use of FRANCHISOR, FRANCHISEE, and other TRANSMISSION USA franchisees or to such other entity as FRANCHISOR shall designate. FRANCHISEE further agrees to have all franchises owned or controlled by FRANCHISEE participate in the TRANSMISSION USA CREATIVE MARKETING FUND.

The TRANSMISSION USA CREATIVE MARKETING FUND will be used for the production and distribution of advertising materials, personal appearances, and other promotional or related materials which FRANCHISOR, in its sole discretion, deems desirable to advertise and promote TRANSMISSION USA SERVICE CENTERS nationally or regionally. FRANCHISOR shall be entitled to direct the utilization of the TRANSMISSION USA CREATIVE MARKETING FUND for the benefit of FRANCHISOR in the sole discretion of FRANCHISOR.

FRANCHISOR reserves the right to consult an advisory alliance of franchisees on the use and spending of this fund.

FRANCHISEE agrees that FRANCHISOR, in its own name, shall be entitled to recover the sum of monies due from the FRANCHISEE for the benefit of TRANSMISSION USA CREATIVE MARKETING FUND and/or FRANCHISOR's advertising agency.

FRANCHISEE further understands and agrees that the TRANSMISSION USA CREATIVE MARKETING FUND exists solely for the production and distribution of advertising materials or other such uses as may be approved by the FRANCHISOR, and that FRANCHISEE is solely responsible for placement of said materials in the media and the costs related thereto.

(b) Local Advertising and Advertising Pools. FRANCHISEE acknowledges that its participation in advertising programs and promotional activities is essential. The FRANCHISEE shall make the expenditures required by and otherwise fully comply with a local advertising budget to be developed for it with the assistance of FRANCHISOR.

FRANCHISEE agrees, at its expense, to advertise in the classified or yellow pages of the local telephone directory under the listing of "Transmissions," "Automobile Repairing and Service," and such additional listings as may be designated by FRANCHISOR. In such advertising, FRANCHISEE agrees to use only ad mats approved by FRANCHISOR. The size of an advertisement to be placed in a market area with multiple service centers will be determined by a majority of the service centers in the market area, subject to the approval of FRANCHISOR.

FRANCHISEE agrees in its advertising to use and reproduce FRANCHISOR's trademarks, service marks and other symbols exactly and accurately and in a manner which will best protect these rights and to refrain from the use of FRANCHISEE's own name, or any name other than "MR. TRANSMISSION" in connection with any of FRANCHISOR's trademarks, service marks or other symbols.

The FRANCHISEE shall place advertising only with advertising agencies approved in writing by FRANCHISOR and shall be in default hereunder, and FRANCHISOR, in addition to any other remedies which it may have for violation of this Franchise Agreement, may, in its own name, recover any such sums from FRANCHISEE, including, but not limited to, attorney's fees and costs.

Without limiting any of the language found elsewhere in this Agreement, FRANCHISEE agrees to adhere to such advertising regulations as FRANCHISOR may impose from time to time, to obtain FRANCHISOR's approval of FRANCHISEE's local advertising, and to use only advertising materials provided or approved by FRANCHISOR.

FRANCHISEE agrees to share local advertising expenses with other franchisees in related, adjoining or overlapping Designated Marketing Area (as designated by FRANCHISOR), to participate fully in and cooperate with any MR. TRANSMISSION local advertising group now in existence or hereinafter established and to execute any documents in connection with such local advertising which FRANCHISEE is reasonably requested to execute by FRANCHISOR or the local advertising group. FRANCHISEE shall execute an Agreement to Participate in a Local Advertising Group at the time of FRANCHISEE's execution of this Franchise Agreement. Should FRANCHISEE fail or refuse to execute any such documents, FRANCHISEE hereby appoints any officer of FRANCHISOR as its attorney-in-fact to execute such documents in FRANCHISEE's place and stead. All decisions of the local advertising pool shall be final as to FRANCHISEE, and all such decisions shall be based upon majority rule, with each Service Center in the pool having one (1) vote. If the FRANCHISEE fails to pay promptly any amount due his advertising agency or his local advertising group or pool, then either FRANCHISOR or all other

franchisees of FRANCHISOR in the local advertising group or pool of which FRANCHISEE is a member, or the local advertising group or pool shall be entitled to recover the amount due from the FRANCHISEE. The FRANCHISEE recognizes that all local advertising inures to his benefit and to the benefit of all franchisees in the local advertising group. FRANCHISEE acknowledges that despite failure to contribute his proportionate share, local advertising expenditures confer substantial benefits on him, and further acknowledges his responsibility for payment therefor. FRANCHISOR, in addition to any remedies available to it for default under this Franchise Agreement, reserves the right to have or allow the local advertising group to seek the enforcement of this obligation, and FRANCHISEE shall be liable for and pay all costs and expenses thereof, including, but not limited to, attorney's fees and court costs.

18. HOLD HARMLESS AND INSURANCE. FRANCHISEE agrees that it will indemnify and save harmless FRANCHISOR, its officers, directors, agents, employees, servants, divisions and its subsidiaries from all liabilities, taxes, losses, fines, costs, damages, expenses (including reasonable attorney's fees and court costs), as well as all claims, demands, actions, suits or proceedings, of any kind or nature, asserted by any entity or anyone whomsoever, arising or growing out of or otherwise connected with FRANCHISEE's operation of the MR. TRANSMISSION SERVICE CENTER. FRANCHISEE shall immediately upon receipt furnish FRANCHISOR with copies of all complaints, subpoenas, and other legal documents alleging or relating to any civil or criminal suit or administrative action it receives brought against FRANCHISEE, FRANCHISOR or their affiliates or principals.

FRANCHISEE shall, prior to the opening of the Service Center, and at all times during the term of this Agreement (and any renewals thereof), at its own expense, maintain and keep in force comprehensive general liability insurance, including the Broad Form CGL (Comprehensive General Liability) coverage endorsement, which endorsement must include product liability insurance, against the claims of all persons, including but not limited to employees and/or customers, with such limits as may from time to time be determined by FRANCHISOR, which limits shall not be less than One Million Dollars ($1,000,000.00) combined single limit coverage for bodily injury and property damage resulting from each occurrence. FRANCHISEE shall maintain and keep in force a One Million Dollar Umbrella Policy over said general liability policy. All insurance shall name both FRANCHISOR and U.S.T.P. division of Transmission City, Inc. as additional insureds and shall protect FRANCHISOR, U.S.T.P. and FRANCHISEE against any liability which may accrue against them or any of them by reason of the ownership, maintenance, or operation by FRANCHISEE of its MR. TRANSMISSION SERVICE CENTER or on account of FRANCHISOR'S or FRANCHISEE'S operations or activities related thereto, at any place whatever.

FRANCHISEE shall also obtain the following insurance coverage: garagekeeper's direct primary insurance coverage in the amount of not less than $10,000 per service bay at FRANCHISEE'S Service Center and include business interruption insurance and all risk insurance on the MR. TRANSMISSION SERVICE CENTER, including improvements, furnishings, fixtures and inventory for the full value thereof. Franchisee shall also obtain workmen's compensation and employer's liability coverage with employer's liability limits of One Hundred Thousand Dollars ($100,000.00), or statutory amounts, whichever is greater and Employee Practices Liability Insurance.

All of said insurance coverage required by this Agreement shall be at the expense of FRANCHISEE, shall be for the benefit of FRANCHISEE and FRANCHISOR and U. S. TRANS PARTS; shall be placed only with an insurance carrier or carriers satisfactory to FRANCHISOR; shall not be subject to cancellation or any material change except after thirty (30) days written notice to FRANCHISOR; shall provide that no failure of the FRANCHISEE to comply with any term, condition or covenant of this Agreement or other conduct of the FRANCHISEE, or those for whose conduct it is responsible, shall terminate or otherwise affect the protection afforded under said policy to FRANCHISOR. A certificate of insurance, reflecting full compliance with the requirements of this paragraph shall at all times be kept on deposit at the general offices of FRANCHISOR. If FRANCHISEE fails to comply with this paragraph, FRANCHISOR may, in addition to any other remedies available to it for breach of this Franchise Agreement, obtain such insurance and require FRANCHISEE to pay the costs thereof upon demand.

Upon request by FRANCHISOR, FRANCHISEE shall furnish FRANCHISOR with suitable evidence that the insurance premiums have been paid. If FRANCHISEE fails to comply with any of these

requirements, FRANCHISOR may terminate this Agreement immediately, or in the alternative, at FRANCHISOR's option, FRANCHISOR may obtain such insurance and keep the same in full force and effect, and the premiums thereof shall be immediately due from FRANCHISEE to FRANCHISOR.

FRANCHISEE'S obligation to indemnify FRANCHISOR, as described in this paragraph, is not limited to the extent of or amount of insurance coverage obtained by FRANCHISEE. Notwithstanding any language to the contrary, FRANCHISOR shall be obligated to defend and save harmless FRANCHISEE against claims for trademark infringement as provided in paragraph 9 hereinabove.

FRANCHISOR reserves the right to alter or amend the insurance requirements hereunder upon written notice thereof to FRANCHISEE.

19. INDEPENDENT CONTRACTOR.

(a) The only relationship between the parties shall be that of independent contractors. It is understood and agreed that no agency, employment, or partnership is hereby created between the parties, and the business to be operated by FRANCHISEE is separate and apart from any which may be operated by FRANCHISOR. No representations will be made by either party which would create an apparent agency, employment or partnership relationship, and neither party shall have the authority to act for the other in any manner to create obligations which would be binding upon the other. Neither party shall be responsible for any obligations or expenses whatsoever of the other (except as set forth herein), nor shall either party be responsible for any act or omission of the other or for any act or omission of an employee or agent of the other.

(b) In all dealings with third parties, including, without limitation, employees, suppliers and guests, FRANCHISEE shall disclose in an appropriate manner acceptable to FRANCHISOR that it is an independent entity. FRANCHISEE agrees to display on the premises of the MR. TRANSMISSION SERVICE CENTER in a prominent place in public view, a plaque prepared at its expense and approved by FRANCHISOR, stating the name and address of the FRANCHISEE and the fact that FRANCHISEE is operating the Service Center under a Franchise Agreement with FRANCHISOR and to take such additional steps as FRANCHISOR may reasonably require to establish its independent contractor relationship.

(c) In all advertising, stationery, printed materials, signage and other such items used in connection with the operation of his business, FRANCHISEE must show thereon that the MR. TRANSMISSION SERVICE CENTER licensed hereunder is independently owned and operated.

20. CONFIDENTIAL INFORMATION. The FRANCHISEE acknowledges the confidential nature of the information, manuals, trade secrets, Trans Plus Management (TPM) Software, Intranet access and procedures which will be made available to FRANCHISEE by FRANCHISOR. FRANCHISEE agrees not to divulge, directly or indirectly (except to authorized employees of the FRANCHISEE), any trade secret, or other confidential information, furnished to FRANCHISEE by FRANCHISOR. Upon request of FRANCHISOR, FRANCHISEE will require all of its employees, agents or other persons employed by it, to execute an agreement acknowledging and recognizing FRANCHISOR'S copyright, the confidential nature of certain information, manuals, trade secrets, TPM Software, Intranet access and procedures made available to FRANCHISEE by FRANCHISOR. FRANCHISEE shall promptly cause its employees to execute said agreement and return it upon execution to FRANCHISOR.

Any confidential literature, manuals, TPM Software, Intranet access or passwords given FRANCHISEE will be returned to FRANCHISOR at the expiration or termination of this Franchise Agreement. FRANCHISEE specifically acknowledges that the operating manuals which it receives at the training session described in paragraph 6 is copyright material of FRANCHISOR, is the property of the FRANCHISOR, contains matters which constitute trade secrets, and FRANCHISEE agrees that upon expiration or termination of this Franchise Agreement it will return the operating manuals to FRANCHISOR.

FRANCHISEE agrees not to disclose to anyone for the duration of this Franchise Agreement or any renewal, or at any time after the expiration of termination of this Franchise Agreement or any renewal

14

thereof, directly or indirectly, the confidential information received from FRANCHISOR, whether furnished at the training school, conferences sponsored by FRANCHISOR, or elsewhere, which information relates to methods of operation, servicing, advertising, publicity, promotional ideas, profits, financial status, TPM Softweare, Intranet access or present and future plans for expansion. FRANCHISEE specifically acknowledges that such information is confidential and constitutes part of the trade secrets of FRANCHISOR.

21. ASSIGNMENT BY FRANCHISEE. This Agreement is a personal obligation to the undersigned FRANCHISEE. The FRANCHISEE'S rights to the use of MR. TRANSMISSION'S trade name, trademarks and service marks are not assignable or transferable under any circumstances except in strict compliance with the procedures enumerated in this paragraph and FRANCHISOR shall not unreasonably withhold consent to transfer:

(a) In the event of death of a FRANCHISEE, any person who through intestacy or inheritance acquires the entire interest of FRANCHISEE in the franchise herein granted (hereinafter referred to as the "Heir or Devisee") may continue to retain all rights granted FRANCHISEE in this Agreement, provided that the Heir or Devisee, as a new FRANCHISEE, executes the then current MR. TRANSMISSION Franchise Agreement, assumes all debts and liabilities of any nature owed by FRANCHISEE to FRANCHISOR, and that the Heir or Devisee and the person who is to manage the MR. TRANSMISSION SERVICE CENTER on behalf of the Heir or Devisee shall attend such MR. TRANSMISSION training courses as required by FRANCHISOR and at such times as FRANCHISOR may designate.

In the event that the Heir or Devisee and/or the person who shall manage the MR. TRANSMISSION SERVICE CENTER fails to attend said training courses as required by this paragraph, then the FRANCHISOR at its sole option may terminate all rights conferred in this Agreement and retain any and all license fees or other sums paid by FRANCHISEE to FRANCHISOR. All rights granted to said Heir or Devisee in this paragraph shall be null, void, and of no force and effect in the event that said Heir or Devisee fails to assume all debts or liabilities of any nature owed by FRANCHISEE to FRANCHISOR. Assumption of said liability by the Heir or Devisee shall in no respect constitute a waiver of any rights that the FRANCHISOR may have to recover such sums from the estate of the FRANCHISEE or from other persons or firms who may be liable for said debts or liabilities. The rights conferred to the Heir or Devisee in this paragraph are contingent upon the Heir or Devisee's assumption of the lease of the MR. TRANSMISSION SERVICE CENTER premises signed by FRANCHISEE.

If the Heir or Devisee does not elect to operate the MR. TRANSMISSION SERVICE CENTER or fails to comply with all of the conditions outlined hereinabove, then said Heir or Devisee, or his authorized representative shall sell all of the rights and interests of the Heir or Devisee acquired under this Agreement to FRANCHISOR or to any other purchaser in strict compliance with the procedures enumerated in subparagraphs (c) and (d) below.

(b) In the event of the incapacity of the FRANCHISEE, the guardian or other legally appointed representative (the "Guardian") may continue to operate the MR. TRANSMISSION SERVICE CENTER under the Franchise Agreement and the Franchise Agreement shall continue in effect provided the Guardian or his designee is approved by FRANCHISOR to continue operation of the Service Center (which approval will be not unreasonably withheld) and provided said Guardian or his designee attends the owner's training school required by FRANCHISOR at such times as FRANCHISOR may designate. If the Guardian or his designee is not approved by FRANCHISOR, or fails to attend the owner's training school as required by FRANCHISOR, or if the Guardian elects not to continue operation on behalf of the FRANCHISEE, then the Guardian shall sell all of the rights and interests of the FRANCHISEE acquired hereunder to the FRANCHISOR or other purchaser in strict compliance with subparagraphs (c) and (d) below.

(c) The FRANCHISEE shall not sell, lease, transfer, or assign his rights and interest under this Agreement, or any part hereof, nor any of the assets of same, including, but not limited to, inventory, equipment, parts, fixtures, and the premises, if owned by FRANCHISEE, without in each instance first offering the same to FRANCHISOR on the same terms as FRANCHISEE shall previously have received in a bona fide, written offer from a responsible, fully disclosed prospective purchaser, and thereafter the FRANCHISOR shall have thirty (30) days within which to determine if it wishes to accept said offer. If the

FRANCHISOR should decline or fail to accept said offer, the FRANCHISEE may sell, lease, transfer, or assign to the prospective purchaser within sixty (60) days thereafter, on the same terms and conditions as contained in said offer and subject to the conditions enumerated in (d) below.

(d) In the event that FRANCHISOR does not acquire FRANCHISEE'S rights hereunder, as described in (c) hereinabove, FRANCHISEE may assign and transfer his rights to a prospective purchaser provided first that the purchaser is approved by FRANCHISOR and provided further that the purchaser executes FRANCHISOR'S then standard Franchise Agreement. FRANCHISOR agrees to approve said prospective purchaser if the prospective purchaser has a satisfactory credit rating, is of good moral character, has a good business reputation and the business ability to operate the MR. TRANSMISSION SERVICE CENTER, and further provided that any and all obligations of the FRANCHISEE hereunder are fully paid and satisfied, that outstanding accounts which FRANCHISEE may have with any advertising agency are fully paid and satisfied, that FRANCHISEE'S payments to the MR. TRANSMISSION CREATIVE MARKETING FUND and any local advertising group of licensees are paid in full, that the FRANCHISEE is not in default under any provisions of this Agreement, that the FRANCHISEE and the person or persons having control of the affairs of a corporate FRANCHISEE or other entity shall execute a general release of all claims of any nature against FRANCHISOR, and that the FRANCHISEE shall pay FRANCHISOR the then current transfer fee for its legal and other expenses in connection with the transfer and assignment of FRANCHISEE'S rights. The ownership of the MR. TRANSMISSION SERVICE CENTER may not be transferred to the purchaser, nor shall the purchaser be allowed to take any action with respect to the ownership or operation of the MR. TRANSMISSION SERVICE CENTER licensed hereunder, until (i) the purchaser has completed such training course as may be provided for in the then current Franchise Agreement; and (ii) the purchaser has executed the then current Franchise Agreement, the FRANCHISOR'S then current transfer fee is paid in full; and (iii) the purchaser and FRANCHISEE have arranged for said purchaser to assume FRANCHISEE'S obligations under any lease of the MR. TRANSMISSION SERVICE CENTER premises; and (iv) all payments due FRANCHISOR are paid or adequate arrangements have been made with FRANCHISOR for payment of same. Franchisee agrees to remain personally obligated to Franchisor for any and all of purchaser's or assignee's debts to Franchisor for a period of one year after the date of any assignment and transfer of the Franchise Agreement, the guarantee period. In the event of a default by purchaser or assignee, then the guarantee period will be extended for an additional year from that event of default. Assignment of this Agreement to a purchaser shall not constitute a waiver by FRANCHISOR of any claims, whether known or unknown, that the FRANCHISOR may have against the FRANCHISEE relating to. or in any way connected with FRANCHISEE'S obligations under this Agreement, and shall not be construed as a release of FRANCHISEE or a novation of this Franchise Agreement.

(e) If FRANCHISEE is a individual and desires to assign and transfer his rights to a corporation, he may do so notwithstanding the foregoing limitations on assignment and transfer, upon the following terms and conditions:

(i) The corporation is newly organized and its activities are confined exclusively to operating the MR. TRANSMISSION SERVICE CENTER licensed under this Agreement;

(ii) The FRANCHISEE is the owner of all the stock of the corporation and is the principal executive officer thereof (unless such requirement is waived in writing by FRANCHISOR), and the names and addresses of all officers, directors and shareholders shall be furnished to FRANCHISOR together with the Affidavit of the Secretary of said corporation as to such information;

(iii) All accrued money obligations of the FRANCHISEE to FRANCHISOR are satisfied;

(iv) The corporation and all the officers thereof shall sign an agreement with FRANCHISOR on forms furnished by the FRANCHISOR assuming personally, jointly and severally, all obligations of the FRANCHISEE as set forth in this Franchise Agreement. It is expressly understood that assumption of FRANCHISEE'S obligations by the corporation does not limit the FRANCHISEE'S personal obligations under the Franchise Agreement, and the FRANCHISEE and the corporation shall be jointly and severally liable hereafter; and

(v) The FRANCHISEE shall sign an agreement with FRANCHISOR on forms to be provided by FRANCHISOR guaranteeing full payment of the corporation's money obligations to FRANCHISOR, agreeing to be bound individually by the obligations assumed by the corporation, and agreeing to continue to be bound by the obligations assumed by FRANCHISEE under this Agreement.

(f) If the FRANCHISEE is a corporation or if FRANCHISEE organizes a corporation as provided for in (e) of this paragraph, the capital stock thereof shall not be sold, assigned, pledged, mortgaged or transferred without the prior written consent of FRANCHISOR, except that there may be a sale of all of FRANCHISEE'S capital stock on the same conditions enumerated above in sub-paragraphs (c) and (d) relative to the transfer of FRANCHISEE'S rights hereunder to a purchaser. All stock certificates shall have endorsed on them the following:

"The transfer of the stock is subject to the terms and conditions of a Franchise Agreement dated the 2nd day of **August, 2005**, by and between **Nerak, Inc.**, Franchisee and MORAN INDUSTRIES, INC., an Illinois corporation, Franchisor."

(g) If the FRANCHISEE is a partnership and all the members of the partnership desire to assign and transfer the license of the partnership to a corporation, the partners may do so under the same terms and conditions as set forth in subparagraph (e) of this paragraph, provided that the partners own all of the stock of the corporation and are the principal Executive Officers thereof. In addition, if the FRANCHISEE is a partnership, the right of any partner to sell, assign, pledge, mortgage or transfer his partnership interest shall be subject to the same conditions governing the sale, assignment, pledge, mortgage or transfer of the capital stock of a corporation, as set forth in subparagraph (f) of this paragraph (except that all endorsements shall be printed on units of participation, not stock certificates).

(h) If the FRANCHISEE is or becomes a corporation, FRANCHISEE shall disclose to FRANCHISOR the names and addresses of all officers and directors of the corporation and shall, whenever there is any change, immediately notify FRANCHISOR of the name and address of any new officer and/or director, and upon the change of any officer and/or director, FRANCHISEE agrees to execute a new agreement with FRANCHISOR, consistent with the provisions of subparagraph (e)(iv) of this paragraph.

22. <u>ASSIGNMENT BY FRANCHISOR</u>. This Franchise Agreement and all rights hereunder may be assigned and transferred by FRANCHISOR and shall inure to the benefit of FRANCHISOR'S successors and assigns.

23. <u>COVENANT NOT TO COMPETE</u>. As long as this Agreement shall be in effect, and for a period of two (2) years thereafter, the FRANCHISEE shall not, directly or indirectly, engage or be financially interested in, or associated with, or invest in, the ownership or operation of any shop, center, or business located in the licensed premises or within a radius of twenty-five (25) miles from the licensed premises or any other MR. TRANSMISSION SERVICE CENTER, which shop, center or business specializes in sale, service, and/or repair of transmissions or related services. If any part of this restriction is found by a court of law to be unreasonable in time and/or distance, the restriction may be reduced in time and/or distance by an appropriate order of the court to that deemed reasonable. This restriction shall include, but is not limited to, such action as cessation of operation as a MR. TRANSMISSION SERVICE CENTER in the licensed premises, and FRANCHISEE understands and agrees hereby that in such event, FRANCHISEE may not operate a transmission repair or service facility from the licensed premises during the term stated herein.

In addition as long as this agreement shall be in effect, the FRANCHISEE shall not, directly or indirectly, engage or be financially interested in, or associated with, or invest in, the ownership or operation of any shop, center or business specializing in sale, service and/or repair of transmissions or related services unless that shop, center or business is an approved franchise of FRANCHISOR.

24. <u>TERMINATION BY FRANCHISOR</u>.

(a) Upon the happening of any of the following events, this Agreement shall, at the sole discretion of FRANCHISOR, immediately terminate upon receipt by FRANCHISEE of written notice of termination:

(1) Any breach or failure by FRANCHISEE to perform any terms or conditions of this Franchise Agreement (except the nonpayment of any monies due) including exhibits, schedules and appendices, or failure by the FRANCHISEE to comply with rules, regulations, or directives promulgated by FRANCHISOR if such default shall continue for thirty (30) days (unless a shorter period is provided for elsewhere in this Franchise Agreement) after FRANCHISOR gives written notice of such default to FRANCHISEE, or, if the default cannot reasonably be corrected within said thirty (30) day period (or such shorter period as may be provided elsewhere in this Franchise Agreement), then within such additional time as may be required, assuming FRANCHISEE proceeds with reasonable diligence (unless state law requires a longer period); provided, however, that default in the payment of any sums due FRANCHISOR shall never be deemed to require any longer period of cure;

(2) Notwithstanding anything contained in subparagraph (a)(1) above to the contrary, upon receipt for any reason by FRANCHISEE of the third notice of default from FRANCHISOR in any consecutive twelve (12) month period, regardless of whether or not prior defaults were timely cured;

(3) Notwithstanding anything in subparagraph (a)(1) above to the contrary, if FRANCHISEE'S default under the terms of this Agreement is the nonpayment of any sum due FRANCHISOR, FRANCHISOR shall notify FRANCHISEE in writing of said default in payment and FRANCHISEE shall have ten (10) days after receipt of such notice to fully pay all amounts owing to FRANCHISOR. In the event payment is not made within said ten (10) day period, then FRANCHISOR at its option may terminate this Agreement and this Agreement shall immediately terminate on receipt by FRANCHISEE of the notice of termination by FRANCHISOR (unless state law requires a longer period);

(4) If the location specified in paragraph 1 of this Agreement is an exact location, failure by FRANCHISEE to commence operations within 120 days from the date of execution by FRANCHISEE hereof; or if the location specified in paragraph 1 is a marketing area rather than an exact location, failure to obtain an approved location for the Service Center within the marketing area and to commence operations, all within one year from the date of execution by FRANCHISEE, unless such period is extended by FRANCHISOR in writing;

(5) In the event that FRANCHISEE makes a general assignment or trust mortgage for the benefit of creditors or if the FRANCHISEE shall commit or suffer default under any lease, mortgage, contract or conditional sale, or security instrument, or a petition be filed by or against the FRANCHISEE initiating proceedings under any provisions of the Federal Bankruptcy Code, or if a receiver or similar officer shall be appointed by a court of competent jurisdiction to take charge of all or any part of the FRANCHISEE'S property, or if the FRANCHISEE shall fail to perform or observe any of the provisions required to be performed or observed by the FRANCHISEE under any lease or sublease of the FRANCHISEE'S premises; provided, however, that should any provision of the Federal Bankruptcy Code prohibit the enforcement of this provision, FRANCHISEE shall remain in default hereunder and no additional notice of default hereunder shall be required if and when such prohibition of enforcement shall be removed for any reason. It is further understood and agreed that nothing contained herein shall be construed as a release of any rights of FRANCHISOR under the Federal Bankruptcy Code, and notice is hereby given that FRANCHISOR does not consent to any extension of time for acts required thereunder to be performed by FRANCHISEE, all of which must be performed in strict compliance with the Code;

(6) In the event that FRANCHISEE commits any acts of fraud or misrepresentation or conducts his business in a manner likely to impair FRANCHISOR'S reputation, goodwill, and trade name. Unless required by state law, no notice shall be required under this paragraph;

(7) If the FRANCHISEE ceases to operate as a MR. TRANSMISSION SERVICE CENTER or closes his MR. TRANSMISSION SERVICE CENTER for any reason whatsoever and fails to recommence operation as a MR. TRANSMISSION SERVICE CENTER or reopen within six (6) days from the date of such closing;

(8) In the event that FRANCHISEE is in default under any lease or sublease of the FRANCHISEE's premises;

(9) If the FRANCHISEE attempts to sell, sells, or transfers or assigns any of his rights under this Agreement without approval of FRANCHISOR as provided in paragraph 21 of this Agreement;

(10) If the FRANCHISEE fails to procure and/or maintain any insurance coverages required by the terms of this Agreement;

(11) If FRANCHISEE fails to attend any training course or meeting required by FRANCHISOR;

(12) If FRANCHISEE fails to discharge any employee immediately upon notification by FRANCHISOR that such employee has been convicted of any felony, or that such employee has been convicted of fraud, embezzlement, larceny or other acts of moral turpitude, or upon notification that such employee has been discharged by FRANCHISOR or any other licensee of FRANCHISOR because of conduct by the employee involving fraud, embezzlement, larceny, or other acts of moral turpitude;

(13) If FRANCHISEE fails to honor or pay for Service Center Warranties, or if FRANCHISEE'S warranty fund is not replenished within ten (10) days of demand by FRANCHISOR;

(14) If FRANCHISEE voluntarily abandons the franchise business, for more than five days.

(b) In addition to FRANCHISOR'S right to terminate and not in lieu thereof, FRANCHISOR may enter into FRANCHISEE'S Service Center and exercise complete authority with respect to the operation thereof until such time as FRANCHISOR shall determine that the default of FRANCHISEE has been cured and that FRANCHISEE is complying with the requirements of this Agreement. FRANCHISEE specifically agrees that a designated representative of FRANCHISOR may take over control and operate FRANCHISEE'S Service Center and that FRANCHISEE shall reimburse FRANCHISOR for the full compensation paid to such representative including the cost of all fringe benefits plus any and all expenses reasonably incurred by such representative so long as he shall be necessary, and in any event until the default has been cured and FRANCHISEE is complying with the terms of this Agreement. In connection with this right, FRANCHISOR may obtain a temporary restraining order as a matter of course from any court of competent jurisdiction enjoining and restraining FRANCHISEE from any interference with the right of FRANCHISOR to enter upon the licensed premises and exercise complete control and authority with respect to the operation of the Service Center.

(c) At FRANCHISOR's option, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, said arbitration to be conducted at the offices of the American Arbitration Association located in Chicago, Illinois, or at FRANCHISOR's option at another location, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

## 25. PROCEDURES AFTER TERMINATION OR EXPIRATION.

(a) Upon the expiration or termination of this Agreement for any cause, the FRANCHISEE shall immediately cease operations of any transmission repair or similar business at the location licensed under this Agreement and shall immediately discontinue the use of FRANCHISOR'S trade names, trademarks, or service marks, and all goods and materials, including, but not limited to, signs, structures, fixtures, equipment, literature of any kind, including, but not limited to, all forms of advertising and stationery containing or bearing FRANCHISOR'S trade names, trademarks, or service marks, or any distinctive color schemes or patterns, symbols, designs, or emblems suggestive of FRANCHISOR or anything in any way connecting FRANCHISOR and FRANCHISEE; and so far as the FRANCHISEE may lawfully do so, shall make or cause to be made such removals of or changes in signs, buildings and structures as the FRANCHISOR shall reasonably direct so as to eliminate the name MR. TRANSMISSION from the FRANCHISEE'S premises, and to effectively distinguish the premises from its former appearance and from any other MR. TRANSMISSION SERVICE CENTER.

If the FRANCHISEE shall, upon request, fail or omit to make or cause such changes to be made, then without prejudice to FRANCHISOR'S other rights and remedies, the FRANCHISOR shall have the right to enter upon FRANCHISEE'S premises without being guilty of trespass or any other tort, and to make or cause to be made such changes at the FRANCHISEE'S expense. FRANCHISEE hereby appoints FRANCHISOR its attorney-in-fact for the purpose of taking any and all steps and executing any documents necessary to assign to FRANCHISOR upon expiration or termination of this Agreement each telephone number maintained by FRANCHISEE as a MR. TRANSMISSION franchisee. Notwithstanding the foregoing, FRANCHISEE shall upon execution of this Agreement immediately execute and deliver any and all documents required to assign each telephone number maintained by it as a MR. TRANSMISSION franchisee to FRANCHISOR, and shall not, in any way, use or attempt to use any such telephone number(s), including, but not limited to, having such calls forwarded or "ring over" to any other number. The Telephone Service Assignment is attached hereto as Appendix B-4.

FRANCHISEE shall, at its expense and upon request of FRANCHISOR, also remove and deliver to the FRANCHISOR any material which has been loaned by FRANCHISOR to FRANCHISEE, as well as all consigned inventory which may be in FRANCHISEE'S possession. FRANCHISEE, upon request of FRANCHISOR, shall sell all of its inventory on hand to FRANCHISOR at the depreciated value of said inventory on FRANCHISEE'S books, less freight and handling cost.

(b) In no event shall termination or expiration of this Agreement affect, modify or discharge any claims, rights, causes of action or remedies, which FRANCHISOR may have against FRANCHISEE, whether under this Agreement or otherwise, for any reason whatsoever, whether such claims or rights arise before or after expiration or termination of this Agreement. No act of FRANCHISOR taken pursuant to any rights under the terms of this Franchise Agreement, any other agreement, or at law or sounding in equity shall be deemed as a release of FRANCHISEE or consent to any action of FRANCHISEE, nor shall any such act be deemed a novation of this Agreement.

(c) Upon termination or expiration of this Agreement, FRANCHISOR shall have the right to credit all monies of FRANCHISEE being held under deposit or otherwise, to any debts which the FRANCHISEE owes FRANCHISOR or its subsidiaries or divisions, FRANCHISEE'S advertising agent, FRANCHISEE'S insurance carrier, the MR. TRANSMISSION CREATIVE MARKETING FUND or any local advertising group or pool of which FRANCHISEE is a member. FRANCHISEE shall remain liable for all monies owed pursuant to this Franchise Agreement prior to and after any authorized or unauthorized transfer or attempt to transfer all or any part of FRANCHISEE'S rights and interest hereunder, or the cessation of operation as a MR. TRANSMISSION SERVICE CENTER by FRANCHISEE.

(d) Without limiting any of the foregoing, upon expiration or termination of this Agreement, the FRANCHISEE shall execute such documents and take such action as FRANCHISOR shall deem reasonably necessary or desirable to demonstrate the fact that FRANCHISEE has ceased using the trademarks, trade names, service marks and other distinctive commercial symbols, color schemes, patterns or emblems suggestive of a MR. TRANSMISSION SERVICE CENTER and otherwise has terminated its rights hereunder.

(e) The termination of this Agreement shall not affect, modify or discharge any claim, rights, or causes of action which MR. TRANSMISSION may have against FRANCHISEE, under this Agreement or otherwise, whether such claims or rights arise before or after termination, and FRANCHISEE agrees hereby that in addition to any other damages to which FRANCHISOR may be entitled, FRANCHISOR may collect a sum equal to the then present value of all future royalty payments which would have been due hereunder for the remainder of the term, which sum shall be computed by FRANCHISOR and based upon the average monthly gross sales (as the term "gross sales" is defined elsewhere in this Agreement) of FRANCHISEE, during the term of this Agreement.

26. **ATTORNEY'S FEES.** FRANCHISEE shall pay FRANCHISOR all reasonable costs and expenses, including, but not limited to, attorney's fees and court costs, incurred by FRANCHISOR in connection with any legal proceeding involving the enforcement of any provision of this Agreement. FRANCHISEE shall also pay any such expenses incurred by FRANCHISOR for defense of any suit brought by FRANCHISEE against FRANCHISOR in which judgment is rendered for FRANCHISOR, or in any suit which is brought against FRANCHISOR which is the responsibility of FRANCHISEE or connected

in any way with the operation by FRANCHISEE of the MR. TRANSMISSION SERVICE CENTER licensed hereunder.

27. <u>EQUITABLE RELIEF</u>. The parties hereto agree and stipulate that the restraints upon the FRANCHISEE as described throughout this Agreement, including, but not limited to, those provisions within the paragraph entitled "COVENANT NOT TO COMPETE" are reasonable with regard to the limitations; necessary for the protection of the FRANCHISOR and its business; and that such restraints will not be unduly burdensome upon the FRANCHISEE. In addition to all the remedies at law available to FRANCHISOR in the event of any breach of this Agreement by the FRANCHISEE, the FRANCHISEE agrees that a violation of any of the covenants, terms or provisions hereof to be performed by FRANCHISEE pursuant to this Agreement will cause irreparable harm to the FRANCHISOR and that the actual amount of damages will be impossible to ascertain. FRANCHISEE agrees that because of the impossibility of determining FRANCHISOR'S total damages in the event of such breach, FRANCHISOR shall be entitled as a matter of course to a temporary restraining order, temporary injunction, and/or a permanent injunction from any court of competent jurisdiction without prior notice thereof to FRANCHISEE, which right of notice, if any, is expressly waived with full knowledge and consent of FRANCHISEE, enjoining and restraining the further violation of any provision of this Agreement, prohibiting FRANCHISEE from any interference with the assertion of any rights of FRANCHISOR, and/or granting possession and control of the center licensed hereunder to FRANCHISOR. Nothing contained herein shall be construed as in any way limiting the rights of the FRANCHISOR to enforce this Agreement or to avail itself of any remedies available to it in law or in equity or otherwise, or as a waiver of any rights to recover damages from FRANCHISEE for any violation. In the event a bond is required to be posted by the FRANCHISOR in order to obtain injunctive relief hereunder, FRANCHISEE agrees and stipulates that the bond in an amount not to exceed Five Thousand Dollars ($5,000.00) shall in all instances be adequate.

28. <u>FAILURE TO EXERCISE RIGHTS</u>. No failure of FRANCHISOR to exercise any power or rights given to it hereunder or to insist upon strict compliance with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of FRANCHISOR'S right to demand exact compliance with the terms hereof. Waiver by FRANCHISOR of any particular default by FRANCHISEE shall not affect or impair the FRANCHISOR'S rights in respect to any subsequent default of the same or a different nature; nor shall any delay or omission of FRANCHISOR to exercise any rights arising from a default affect or impair the FRANCHISOR'S rights as to said default or any subsequent default.

29. <u>LEASE</u>. If FRANCHISEE leases or subleases the property on which the franchise will be operated, any such sublease or lease must be attached hereto as Exhibit "A," and FRANCHISEE must provide FRANCHISOR with a copy of such lease prior to the commencement of operation of the MR. TRANSMISSION SERVICE CENTER licensed hereunder. FRANCHISEE further agrees to include the following provisions in any such lease or sublease:

In the event of any breach by FRANCHISEE of any of the provisions contained herein, and in the further event that this lease shall be terminated by Lessor, or if Lessee shall surrender possession of the premises, or be expelled or removed by Lessor for any reason, or should Lessee be more than thirty (30) days late in the payment of any rental or the performance of any other obligations (whether monetary or otherwise) under the terms of this Lease, Lessor shall give written notice thereof by registered mail to MORAN INDUSTRIES, INC., MR. TRANSMISSION division, 4444 West 147th Street, Midlothian, Illinois 60445, and MORAN INDUSTRIES, INC. shall have the exclusive option within ten (10) days of receipt of said notice to to, the obligation of any rental then past due). In the event of such assumption, MORAN INDUSTRIES, INC. shall acquire all of the right, title, and interest of Lessee in and about said premises.

In addition, should MORAN INDUSTRIES, INC. terminate the Franchise Agreement for the operation of the MR. TRANSMISSION SERVICE CENTER on these premises, MORAN INDUSTRIES, INC. will give notice thereof to Lessor, and the same shall be considered by Lessor and Lessee as a breach of this Lease on the part of Lessee. This notice shall also include

a statement of MORAN INDUSTRIES, INC.'S intent to assume Lessee's obligations hereunder. Upon the receipt of such notice, Lessor shall immediately assign all of the right, title, and interest of Lessee in and about said premises to MORAN INDUSTRIES, INC. under the same terms and conditions as contained in the Lease.

Lessor and Lessee understand and agree that the premises leased hereby shall be operated solely as a licensed MR. TRANSMISSION SERVICE CENTER unless such requirement is waived in writing by MORAN INDUSTRIES, INC.

Failure to provide such lease or sublease prior to the beginning of operation of the MR. TRANSMISSION SERVICE CENTER licensed hereunder and/or failure to include the above provision in any third-party lease shall constitute an item of default hereunder and shall entitle FRANCHISOR to enforce any and all rights and remedies available to it, including, but not limited to, the right to injunctive relief granting possession and control of the premises to FRANCHISOR.

30. SECURITY INTEREST. FRANCHISEE hereby grants to FRANCHISOR a security interest in any and all personal property, equipment, inventory and fixtures owned by FRANCHISEE and used or usable in connection with the operation of the franchise. This security interest shall be security for any and all royalties, damages, expenses or other sums owed to FRANCHISOR hereunder and for any other amounts owed by FRANCHISEE to FRANCHISOR. FRANCHISEE agrees to execute any documents, including but not limited to, a UCC-1 (or replacements therefor or extension thereof) reasonably believed by FRANCHISOR to be necessary to perfect said security interest prior to the opening of the MR. TRANSMISSION SERVICE CENTER licensed hereunder, and hereby appoints FRANCHISOR as its attorney-in-fact for the purpose of executing such documents should FRANCHISEE fail so to do.

31. COMPLIANCE WITH LAWS. FRANCHISEE agrees to conduct its business in strict compliance with all applicable laws, ordinances, regulations, and other requirements of any federal, state, county, municipal or other governmental authority and will obtain at its own expense all permits, licenses, and other consents for the operation of its business. FRANCHISOR shall immediately upon receipt deliver to FRANCHISEE a copy of any notice or other instrument which alleges a violation of any municipal, state, federal, or any other governmental law, ordinance, rule, regulation, or order of any governmental agency or authority. Further, FRANCHISEE agrees hereby to give notice to FRANCHISOR of any customer complaints made to any consumer agency, including, but not limited to, the Better Business Bureau, State or Federal Agencies, or other such entities, and further agrees to promptly respond to and answer any such complaints, with a copy of such answer to be provided to FRANCHISOR immediately. Should FRANCHISOR be advised by any such agency of the investigation of FRANCHISEE'S business for any reason whatsoever, FRANCHISEE shall fully cooperate in any request for cooperation in such investigation and shall pay any and all expenses incurred by FRANCHISOR therein, including, but not limited to, investigation fees, fines, penalties, court costs, attorney's fees and interest.

32. SEVERABILITY. In the event any of the terms, conditions or clauses of this Agreement shall be determined by a court of competent jurisdiction to be illegal or unenforceable, or be declared by such court to be invalid, then only those terms, conditions, or clauses as so determined by the court shall be affected, and all other terms, conditions and clauses hereof shall remain fully valid and enforceable according to law.

Further, in the event any state or other governmental authority has enacted or promulgated, or subsequently enacts or promulgates, any legislation or regulation which affects, alters or controls the terms and substance of this Agreement, such shall automatically become a part of this Agreement and any portions hereof in conflict therewith shall be amended to conform with such legislation or regulation.

33. NOTICE. All notices required hereunder shall be deemed properly given if one party shall mail the same, postage prepaid, to the other by registered or certified mail, Federal Express, UPS, hand delivery or courier service (a) if to the FRANCHISEE, to the address of the MR. TRANSMISSION SERVICE CENTER licensed hereunder and/or his last known address; (b) if to FRANCHISOR, to the principal address of its home office, marked to the attention of the President. In the event any notice sent by FRANCHISOR shall be returned for any reason, then it shall be deemed that FRANCHISEE has

## AMENDMENT TO FRANCHISE AGREEMENT

This Amendment is made this 2nd day of August, 2005, in accordance with Section 39 ENTIRE AGREEMENT, of the attached Franchise Agreement between Moran Industries, Inc. and Nerak, Inc. The following paragraph(s) of Section(s) 11 ROYALTY FEE shall be amended as follows:

11. **ROYALTY FEE.** Following the commencement of operations by FRANCHISEE, FRANCHISEE shall pay to FRANCHISOR, in weekly amounts (to be mailed and post-marked not later than Wednesday of each week during the term hereof and to be received by FRANCHISOR by Friday of each week), a royalty fee in a sum equal to five percent (5%) of the gross sales, as hereinafter defined, made by FRANCHISEE during the preceding calendar week.

FRANCHISEE shall mail weekly to FRANCHISOR (i) an accurate business report showing the gross sales received by it during the preceding calendar week on such forms as are provided by FRANCHISOR at FRANCHISEE's expense, (ii) a check, cashier's check or money order in full payment of all royalty fees due, and (iii) such other forms and/or reports as are specified in paragraph 12. The preceding items shall be mailed to FRANCHISOR so as to be received in the offices of FRANCHISOR no later than Friday of each week. Royalties shall be paid without penalty if mailed and postmarked not later than Wednesday and received by FRANCHISOR on or before Friday of each week. FRANCHISEE shall pay any and all fees and other charges in connection with this Franchise Agreement (including, without limitation, the continuing franchise fees, royalty fees, continuing advertising fee, equipment, supplies and advertising charges, and any applicable late fees and interest charges) by electronic, computer, wire, automated transfer, ACH debiting, and bank clearing services (collectively "Automated Payment"), and FRANCHISEE shall undertake all action necessary to accomplish such transfers. If FRANCHISEE fails to pay its royalties as set forth above, FRANCHISEE shall pay the following late payment charges to FRANCHISOR: (1) a one percent (1%) additional gross sales royalty shall be paid by the FRANCHISEE in any week where the royalty payment is not paid, an additional one percent (1%) gross sales royalty shall accrue against the current week's royalty and the past due royalty, i.e., if late one (1) week, the royalty shall be six percent (6%); if late two (2) weeks, the royalty shall be seven percent (7%); if late three (3) weeks, the royalty shall be eight percent (8%). At the expiration of the first five year period and at the expiration of each five year period thereafter during the term of this Agreement, FRANCHISOR, may adjust said royalty fee provided, that said royalty fee will not exceed ten percent (10%) of gross sales at any time during the term of this Agreement.

All paragraph(s) of Section(s) 11 not specifically amended by this agreement shall remain unaltered and in full effect.

ATTEST:

_____

Moran Industries, Inc., an Illinois corporation

By _Barbara Moran_

Its _President_

ATTEST:

_____

Nerak, Inc.

By _____

Its _Pres._

1

received proper notice under the terms of this Franchise Agreement, and FRANCHISOR may proceed to enforce its rights hereunder at law or in equity.

34. <u>APPLICABLE LAW</u>. The parties have finalized this Agreement in the City of Midlothian, County of Cook, State of Illinois, and agree that this contract and their actions hereunder shall be governed by and construed in accordance with the laws of the State of Illinois. The FRANCHISEE agrees and consents to the jurisdiction and venue of the United States District Court for the Northern District of Illinois and/or any court of record of Cook County, Illinois, with respect to any proceedings which arise out of or are connected in any way with the operation of the MR. TRANSMISSION SERVICE CENTER licensed hereunder.

35. <u>IMPROVEMENTS TO METHOD OF OPERATION</u>. FRANCHISOR expressly reserves the right to revise, amend and change, from time to time, the method of operation of MR. TRANSMISSION SERVICE CENTERS, or any part thereof. Any and all such revisions, amendments, changes and improvements developed by FRANCHISOR, FRANCHISEE, or other Franchisees, shall be and become the sole and absolute property of the FRANCHISOR, and FRANCHISOR shall have the sole and exclusive rights to copyright, patent, register and protect such improvements in FRANCHISOR'S own name, and FRANCHISEE agrees to abide by any such changes.

36. <u>PRONOUNS AND DEFINITION OF TERMS</u>. All terms and words used in this agreement regardless of the number and gender in which they are used shall be deemed and construed to include any other number, and any other gender, as the context or sense of this agreement or any provision hereof may require, as if such words had been fully and properly written in the appropriate number and gender. In the event that the "Franchisee" consists of two or more individuals or in the event that Franchisee is a corporation, then such stockholders or individuals shall be jointly and severally liable, and references to the "Franchise" in this Agreement shall include all such individuals and stockholders.

37. <u>CAPTIONS</u>. The paragraph captions as to contents of a particular paragraph herein are inserted only for convenience, and are no way to be construed as part of this Franchise Agreement, or as a limitation of the scope of the particular paragraph to which they refer.

38. <u>COMPUTERIZED CUSTOMER SERVICE SYSTEM</u>. FRANCHISEE understands and agrees that FRANCHISOR distributes and maintains Trans Plus Management Software in conjunction with the Intranet which FRANCHISOR requires to be in operation in the licensed MR. TRANSMISSION SERVICE CENTER. FRANCHISEE agrees hereby to purchase such system from FRANCHISOR for use in its Service Center. FRANCHISEE agrees to pay any monthly or annual maintenance fee relating to use of FRANCHISOR's Trans Plus Management Software. FRANCHISEE agrees to submit reports via the Intranet and must acquire access to do so.

FRANCHISEE further agrees to attend any training school required by FRANCHISOR in connection with the operation of Trans Plus Management Software, at FRANCHISEE'S sole cost and expense.

In addition to the reports required in the preceding paragraphs FRANCHISEE agrees to furnish FRANCHISOR on a weekly basis, the following reports, including but not limited to (i) Daily/Weekly Business report, (ii) Weekly Business report, (iii) Cash Received report, (iv) Center Summary report, (v) Completed/Not Delivered report, and (vi) Center Activity report via the Intranet.

FRANCHISEE further agrees hereby that FRANCHISOR may, without any further approval being required, poll FRANCHISEE'S computer system and obtain any and all information contained therein, by any necessary method, including but not limited to, direct telephone connection, at any time deemed necessary by FRANCHISOR, whether on a routine basis or under special circumstances.

39.  <u>ENTIRE AGREEMENT</u>.  THIS DOCUMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES CONCERNING THE SUBJECT MATTER HEREOF, AND NO REPRESENTATIONS, INDUCEMENTS, PROMISES, OR AGREEMENTS, ORAL OR OTHERWISE, BETWEEN THE PARTIES WITH REFERENCE THERETO AND NOT EMBODIED IN THIS AGREEMENT SHALL BE OF ANY FORCE AND EFFECT EXCEPT FOR OR OTHER THAN THOSE CONTAINED IN THE UFOC. ANY AGREEMENTS MADE HEREINAFTER SHALL BE INEFFECTIVE TO CHANGE, MODIFY, ADD TO OR DISCHARGE IN WHOLE OR IN PART, THE OBLIGATIONS AND DUTIES UNDER THIS AGREEMENT, UNLESS SUCH AGREEMENT IS IN WRITING AND SIGNED BY FRANCHISEE AND BY AN OFFICER OF FRANCHISOR.

ATTEST:

MORAN INDUSTRIES, INC.,
an Illinois corporation

By: _____

Its: _____

Its: _____
FRANCHISOR

ATTEST:

Nerak, Inc.

_____
James C. Higdon

ADDRESS OF FRANCHISEE:

6303 Cornell Ct.
Georgetown, IN 47122

If FRANCHISEE is a partnership or a corporation, this Agreement and all obligations, promises and covenants of FRANCHISEE must be guaranteed individually and personally.

Rev. 06/15/04

24

GUARANTEE

On this 2nd day of **August, 2005**, in consideration of the benefits the undersigned derives from **Nerak, Inc.** ("FRANCHISEE") entering into a Franchise Agreement with Moran Industries, Inc., and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned guarantor(s) hereby guarantees the payment of all fees and costs and the performance by FRANCHISEE or FRANCHISEE's successors or assigns of all covenants and agreements of the above Franchise Agreement. Guarantor shall be directly and primarily liable, jointly and severally, with FRANCHISEE for all of the foregoing.

Guarantor absolutely and unconditionally covenants and agrees that in the event that FRANCHISEE is unable to, or does not, pay, perform or satisfy FRANCHISEE's obligations in a full and timely manner, for any reason, including, without limitation, the liquidation, dissolution, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment of, or other similar proceedings affecting the status, composition, identity, existence, assets or obligations of FRANCHISEE or the disaffirmance or termination of any of FRANCHISEE's obligations in or as a result of any such proceedings, Guarantor shall pay, perform or satisfy FRANCHISEE's liabilities and that no such occurrence shall in any way reduce or affect Guarantor's obligations hereunder. Upon the occurrence of a default in the prompt payment, timely performance and satisfaction in full of FRANCHISEE's obligations, all of the obligations of the Guarantor shall, at the election of FRANCHISOR, become immediately due and payable. FRANCHISOR need not exhaust its remedies against FRANCHISEE or exercise any of the other remedies available to FRANCHISOR, prior to, concurrently with or after proceeding against Guarantor to collect the full amount of Guarantor's obligations hereunder. The term "FRANCHISEE's obligations" shall mean the payment of all amounts due and the performance and observance of all covenants, conditions and obligations contained in the Franchise Agreement and all renewals, extensions, amendments, modifications and replacements of any of the foregoing and all other indebtedness or obligations of FRANCHISEE to FRANCHISOR, of every kind or nature.

Guarantor hereby expressly waives:

A. Notice of acceptance of this Guarantee, notice of any default under the Franchise Agreement, notice of any matter concerning the financial conditions of FRANCHISEE or notice of the taking of any action or the exercise of any remedy by FRANCHISOR under the Franchise Agreement;

B. Presentment, demand, notice of dishonor, protest and notice of protest, notice of any and all defaults and all other notices whatsoever; and it being the intention of Guarantor to, and Guarantor does hereby, waive all defenses, including those given to sureties or guarantors at law or in equity, other than the actual payment and performance of FRANCHISEE's obligations.

_____
**James C. Higdon**

1

## EXHIBIT A TO FRANCHISE AGREEMENT

## LEASE OR SUBLEASE

(Franchisee's lease agreement or sublease agreement for the licensed premises, if any, should be inserted in this portion.)

1

## AGREEMENT TO PARTICIPATE
## IN LOCAL ADVERTISING GROUP

This agreement entered into this 2nd day of **August, 2005**, by and between **Nerak, Inc.** ("Franchisee") and the local Mr. Transmission Advertising Group (the "Group") located in the Area of Dominant Influence of **Middletown, Kentucky** .

### W I T N E S S E T H:

WHEREAS, Franchisee and the Group acknowledge that advertising is necessary to the successful operation as a franchisee of a Mr. Transmission Service Center; and

WHEREAS, Franchisee and the Group acknowledge that advertising by all Mr. Transmission franchisees within the local market directly benefits all other Mr. Transmission Service Centers in local market.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, Franchisee and the Group do covenant and agree as follows:

1. The Group shall formulate, develop and administer a local advertising program which shall be for the benefit of all members of the Group, including Franchisee. The Group and each Franchisee is ultimately responsible for compliance with Federal, State and Local Laws and Regulations regarding advertising.

2. Franchisee shall fully discharge his/its obligation to cooperate with and participate in the advertising program established by the Group and approved by Moran Industries, Inc. (the "Franchisor").

3. In the event that Franchisee is in default of any money due the Group or fails to participate in any advertising program of the Group and make payment for it, Franchisee shall be subject to a five percent (5%) delinquency charge above the amount of the monies actually billed to Franchisee by the Group, plus attorney fees and expenses necessary in the event such default is referred to an attorney for collection.

4. Franchisee shall prepare and submit to the Group as directed by the Group any and all information required to administer and develop the local Mr. Transmission advertising program.

5. Franchisee's obligations hereunder shall be for a period of equal duration to the duration of his/its franchise agreement with Franchisor and any renewal thereof.

6. Franchisee's obligation to pay his/its share of local advertising shall begin the first full week after the actual date of the opening of Franchisee's Mr. Transmission Service Center. If the center is an existing location, the franchisee shall pay a prorated share from the actual date of the closing.

7. Franchisee shall, upon request, execute any agreements requested by the Group which are necessary to effectuate the purposes of this Agreement.

8. Franchisees shall pay to the Group for Group advertising and administration an amount to be determined from time to time as outlined in the Franchise Agreement.

9. Such payments shall be mailed each Monday for the previous weeks assessment.

10. The Franchisor reserves the right to form, change, dissolve or merge cooperatives based on changes in the Designated Marketing Area as defined by the Nielson Rating System.

Nerak, Inc.

James C. Higdon